George L. WINGER, Trustee, Respondent,

v.

GENERAL AMERICAN LIFE INSURANCE
COMPANY, Appellant.

No. 47837.

Supreme Court of Missouri,

Division No. 1.

Feb. 13, 1961.

Motion for Rehearing or to Transfer to Court
en Banc Denied and Opinion Modified on
Court's Own Motion April 10, 1961.

Paul Van Osdol, Jr., Guy A. Magruder, Jr., Terrell, Hess, Van Osdol & Magruder, Kansas City, for appellant. Frank P. Aschemeyer, St. Louis, of counsel.

Barnett & Skeer, David Skeer, Paul Barnett, Kansas City, for respondent.

DALTON, Judge.

This is an action to recover on two life insurance policies issued by defendant. Verdict and judgment were for plaintiff for $54,153.52. Defendant has appealed.

The policies sued on were each for the principal sum of $25,000 and were dated November 26, 1957. The policies were issued to the Midwest Bolt & Supply Company, a corporation (hereinafter referred to as Midwest) as owner and beneficiary, on the life of its then president, Oscar Rose. Thereafter, the corporation assigned both policies to plaintiff-trustee to further secure certain indebtedness of the corporation to Mrs. Eva M. Bowersock, who had transferred certain shares of stock in said corporation to the insured Oscar Rose. The policies were delivered on November 27, 1957, in exchange for two prior policies in the same amount, on the same life, dated November 21, 1957, which had been delivered to Midwest on the 26th day of November 1957. The insured committed suicide on November 29, 1957, two days after the policies sued on were delivered.

Appellant contends the court erred in refusing to direct a verdict for defendant. Appellant says the evidence clearly established (1) that Oscar Rose was not in sound health on November 26 and 27, 1957, when the policies were delivered, but was suffering from the condition which shortly thereafter caused his death; (2) that Midwest, plaintiff's assignor, violated its duty to advise defendant of the knowledge of Rose's condition of health acquired on the morning of November 27, 1957; and (3) that defendant had the right to avoid the policies for misrepresentation in the applications for insurance concerning Mr. Rose's prior medical history and treatment. Respondent, on the other hand, contends that defendant waived the provisions of the applications for the policies that the assured must be in sound health at the time of delivery of the policies; that delivery of the policies and the collection of the premiums therefor by defendant's general agents under the then known facts and circumstances, as shown by this record, constituted a waiver of the right to contend the policies were not in full force and effect from and after November 26, 1957; that defendant is estopped to interpose the mentioned defenses; and that, under the evidence favorable to plaintiff, the defendant was not entitled to a directed verdict on any of the grounds relied on. Appellant replies that defendant did not waive its asserted defenses, because (1) the evidence fails to show that Cochran, its general

agent at Kansas City, "had actual or apparent authority to waive the sound health requirement"; (2) plaintiff was bound by the provisions of the application which prohibited waiver or modification except by home office endorsement and provided that no information acquired by a representative of the company should be binding upon it unless stated in the application; and (3) Cochran and Lowry (general agents) did not know the true condition of Rose's health and could not have waived the sound health provisions of the policies.

 In determining the issues presented, we must consider the evidence in a light most favorable to plaintiff and give him the benefit of all favorable inferences reasonably to be drawn from all the evidence and disregard defendant's evidence unless it aids the plaintiff's case. Highfill v. Brown, Mo.Sup., en Banc, 340 S.W.2d 656. Admitted or conceded facts, however, may not be disregarded.

Oscar Rose, 56 years of age, was married and resided with his wife in Kansas City, Missouri. For several years he had been a member of a partnership engaged in business under the name of Rose Mercantile Company. The partnership was finally dissolved April 15, 1957, and Mr. Rose began to look for other employment. By an agreement dated October 28, 1957, he and his wife Sarah Rose acquired certain shares of stock in the Midwest corporation from Mrs. Eva M. Bowersock. In connection with that transaction a further "Collateral Trust Agreement" was entered into between Oscar Rose and wife and George L. Winger, Trustee (plaintiff-respondent) and Mrs. Bowersock, wherein it appeared that Midwest was indebted to Mrs. Bowersock and the indebtedness evidenced by a note for $50,000 with certain shares of stock pledged as security. The Collateral Trust Agreement provided that Rose and wife would promptly "cause Midwest to obtain new life insurance upon the life of Oscar Rose in the amount of Fifty Thousand and no/100 Dollars ($50,000.00) on

at least a five (5) year term basis and to deposit the same with the Trustee as additional collateral, provided such insurance is obtainable at standard rates." Thereafter, Mr. Rose became president of Midwest and David L. Sheffrey, an attorney and the "duly authorized agent and attorney-in-fact" for both Mr. & Mrs. Rose, became secretary of Midwest.

On October 29, 1957, Mr. Rose made application to defendant for two $25,000 policies of life insurance. The application stated the beneficiary was to be "Mrs. Eva M. Bowersock, creditor as interest may appear, balance to Sarah H. Rose, wife." The reverse side of the application, signed by the Cochran-Lowry Agency, as general agent of defendant, recited: "Al Haas broker has known Mr. Rose & handled his insurance for 25 years. * * * Dr. Ready OK'd Dr. Shifrin & we are requesting his appointment."

On October 29, 1957, Dr. Shifrin gave Mr. Rose the medical examination for the insurance and completed Part II, the medical portion, of the insurance application. On this form, witnessed by Shifrin, Question 19(f) asked if the applicant had "ever had any of the following or symptoms thereof? Epilepsy, Fainting Spells, Mental Disorder, Other Disorder of Brain or Nervous System?" This question was answered "No." Question 19(h) which asked if the applicant had ever been a patient in a hospital, clinic or sanitarium, was answered "Yes." Question 20 asked the name of every physician or practitioner consulted during the past five years and the details of any question answered "Yes" under 19. The answer given was that Mr. Rose had consulted Dr. Louis Forman for nervousness and Dr. A. Shifrin for routine checkup; that this was in February of 1957, for a duration of three weeks, no operation involved, with results of "excellent, good." In answer to Question 27, Dr. Shifrin stated that he had known Mr. Rose "as patient 3 yrs.-well." Question 31(e) asked if there was any evidence of past or

present disease of brain or nervous system; this was answered "No." This application also included a waiver of the protection of the physician-patient relationship, including the following: "I expressly authorize and request any hospital, clinic, physician, surgeon, nurse, practitioner or other person who has attended, examined, or treated me, or who may hereafter attend, examine or treat me, or in which I have been or may hereafter be a patient, to furnish the General American Life Insurance Company with complete information regarding the past, present, or future state of my health * * *."

The applications for the original policies, as signed by Mr. Rose on October 29, 1957, and the applications for the policies sued on dated November 26, 1957, as signed by Oscar Rose and Midwest, all carried in Part I of the applications the following provisions: "(2) No information acquired by any representative of the Company shall bind it unless stated in this application. No printed provision hereof shall be modified or waived except by an endorsement signed by an Officer at its Home Office. * * * (4) If the amount stated in (3) hereof has not been paid in cash with this application, no contract of insurance shall take effect until a policy has been issued by the Company, delivered to and accepted by the Proposed Owners of such policy, and an amount equal to the full first premium thereon has been paid in cash to the Company, all during the lifetime and continued sound health of the Proposed Insured." Part (3) mentioned an amount equal to the first full premium for the insurance applied for.

As stated, the original policies were issued on the first application and were dated November 21, 1957. They arrived for delivery on November 25. At Mrs. Rose's direction, since Mr. Rose was in a hospital, defendant's agent was referred to attorney Sheffrey. On the same date, when Mr. Lowry, of the Cochran-Lowry Insurance Agency, called Sheffrey, Sheffrey told Lowry that Mr. Rose was in the hospital with a "nervous breakdown" and that the policies were Midwest's not Mr. Rose's. Lowry explained how the policies were issued and said he would have to call Cochran, who was out of town, and advise him about Rose being in the hospital and would let Sheffrey know. Lowry then called a second time and asked if it would be all right to talk to Rose's doctor, and Sheffrey said, "Certainly." Lowry, later, called Sheffrey a third time and said that he had good news; that he had talked to Dr. Shifrin and had been told that Rose did not have a nervous breakdown but had "nervous exhaustion; that the man was in perfect physical condition"; "that he was physically sound and that what the man needed was a rest"; that Rose had had this condition before and it had been reported on the insurance application; and that there was no reason from a health standpoint why the policies could not be delivered. Sheffrey then again explained to Lowry why the policies had to be issued to Midwest and then be assigned to plaintiff-trustee.

On November 26, 1957, defendant's general agent, Claude Cochran, sought to deliver the two original policies, dated November 21, 1957, to Sheffrey, secretary of Midwest. Sheffrey then advised Mr. Cochran that Midwest was actually the owner and beneficiary of the policies; that Mr. Rose had no rights of ownership in the policies or any other interest therein; that Mrs. Bowersock was not a creditor of Mr. Rose but a creditor of Midwest. Sheffrey requested that the two policies be reissued in a form to comply with his statement, since the policies were to be assigned to plaintiff-trustee under a Collateral Trust Agreement dated November 1, 1957. When Cochran insisted on delivering the existing policies, Sheffrey agreed with Cochran that, if defendant would that day send out replacement policies issued to Midwest, Cochran could deliver the policies he had; that Cochran and Sheffrey would have a memorandum executed to the effect that the

policies to be delivered were to be treated as Midwest's, and when the "reissued" policies arrived the next day Cochran would pick up the first policies and substitute the new policies issued to Midwest. Defendant's home office was then advised by telephone and arrangements made for the re-issuance of the policies in the changed form for purpose of exchange. However, Sheffrey wanted a memorandum for the exchange signed before the first policies were delivered. He wanted Cochran's and his "complete understanding understood and signed and agreed to." Sheffrey dictated the letter memorandum and addressed it, in rough draft, to defendant. When Cochran saw this he said it should be addressed to Cochran; that he had been given the information about Rose and that "so far the company isn't advised of it." Sheffrey said that was purely up to Cochran, Cochran knew how it should be handled and whatever Cochran thought was satisfactory to Sheffrey. Cochran said: "Well, we got the report from the doctor, the application shows that Mr. Rose was in the hospital previously, showed his condition recited who his doctors were, we got a report from the doctor, the company has passed him on that information, I saw no reason for advising them then, I see no reason for advising them now." Cochran also told Sheffrey that the reason he did not tell the company was that "those things generally get bogged down in a lot of red tape." The letter memorandum was therefore rewritten, addressed to the Cochran–Lowry Agency as "general agents" for defendant instead of to defendant. It was, in part, as follows:

"I am noting that prior to your offer to deliver the above policies yesterday, November 25, 1957, Mr. Rose went to Menorah Hospital, this City, at the recommendation of his physician, for a rest cure; that I called this matter to your attention so that you would be fully advised and informed; that pursuant to my advice you contacted Mr. Rose's physician and the physician who examined him for the company and satisfied

yourself that there was no reason from a health standpoint why the policies should not be delivered; that you have delivered the policies to me this date; that the Midwest Bolt & Supply Company, of which the writer is the Secretary, has this day delivered to you a check covering the premium of the two policies in the respective amounts of $1,312.75 and $693.25, totaling $2,006.00; that you have advised us that we have properly discharged any duty which may exist on our part in informing you. * * *

"We are noting that you have advised the General American Life Insurance Company of the above referred to error and that the company is reissuing said policies, as above requested.

"This letter is to assure you that promptly upon the receipt of the reissued policies the company will execute the application as owner thereof and that Mr. Rose will execute the application as the insured thereof. Also the writer, as Secretary of the company, will execute the collateral assignment to George J. Winger, Trustee * * *."

The letter was then signed and delivered to Mr. Cochran as general agent of defendant and a check for $2,006 was obtained from Midwest and receipted for by defendant's general agent on the closing page of the mentioned letter, as "payment in full of the first year premium on the above policies."

The new policies for exchange arrived in Kansas City on November 27, 1957. The Form of Application, Part I, was prepared in the office of defendant in St. Louis and was dated November 26, 1957. It had been amended to conform to the proposed changes with reference to ownership and beneficiary and was ready to be signed by the proposed insured, Oscar Rose, and by the applicant-purchaser, Midwest. The new applications were signed by Rose, and by Sheffrey for Midwest, on the forms prepared in defendant's St. Louis office.

The new policies were issued without the execution of a new Part II by Rose or a re-examination of Rose by Dr. Shifrin. The new policies merely showed a photostat of Part II of the original application in the form in which it was attached to the original policies when issued. This section of the application had been executed and the medical examination made October 29, 1957. The new policies were delivered as soon as the amended applications were signed and the original policies taken up and cancelled. On the same day Cochran received from Sheffrey assignments by Midwest to plaintiff and Cochran delivered to plaintiff a letter with reference to the policies dated November 26, 1957, in part, as follows:

"At the request of David L. Sheffrey, Secretary of Midwest Bolt & Supply Company, we wish to advise you that we have this day mailed in to the Home Office of the General American Life Insurance Company the originals of the enclosed forms of Assignment, and that the Company upon receipt of the Assignments will record and place them on file and will return to Midwest Bolt & Supply Company a registered copy."

Before the delivery of the above letter, a dispute had arisen as to the form of the assignments of these new policies by Midwest to plaintiff Winger. Cochran refused to approve the modification of the assignment forms as requested by Sheffrey. Cochran then called defendant's home office in St. Louis from Sheffrey's office in in Kansas City and the home office approved the modification of the forms of assignments as requested by Sheffrey.

On November 29, 1957, the insured committed suicide at the Menorah Hospital in Kansas City by hanging himself with a rope. By a letter dated December 16, 1957, plaintiff forwarded to defendant Proofs of Death and the two policies delivered by Cochran to Sheffrey on November 27, and made claim to the amount of the two "re-issued" policies. The Proofs of Death, executed by plaintiff Winger, as assignee, and by Sheffrey for Midwest, as owner-beneficiary, incorporated statements of Drs. Forman and Shifrin. Dr. Forman's statement shows that his first attendance of Mr. Rose, in his last illness, was on October 23, 1957. Dr. Shifrin's statement shows that his first attendance of Mr. Rose, in his last illness, was on November 23, 1957, and that the condition directly leading to death was "anxiety state with depression." In answering Question 5 of the Proofs of Death, which called for information about the hospitals where the deceased had been treated during the five years prior to his death, plaintiff stated: "Claimant cannot supply this information completely or accurately except through the records of the physicians and the hospital, all of which claimant is advised have been furnished you."

Attached to the Proofs of Death was a memo referred to under Question 4 which had asked when deceased first complained of or gave indication of last illness. The answer was: "The negotiations by Mr. Rose for the purchase of the stock of Midwest Bolt & Supply Company covered a period of several months and at times were quite trying and irksome, and from approximately the middle of October Mr. Rose showed signs of strain and nervousness. When the deal was finally closed on the last day of October and Mr. Rose was ready to take over, he seemed to have a sort of letdown. He went to the Company office from November 1st to noon November 12th and from then on stayed away from the office, spending most of his time at home until November 23rd when he went to Menorah Medical Center, Kansas City, Missouri. On November 28th he left the hospital and visited his family at their home for a few hours during the afternoon and then returned to the hospital. On that occasion he spoke of doing away with himself, but his family did not take him seriously to that end, but rather considered his remarks as an expression of disappointment or disgust with himself. On Friday morning November 29, 1957, an officer of Midwest

Bolt & Supply discussed a business matter with Mr. Rose over the telephone, and although he seemed depressed, he seemed quite rational and intelligent in his discussion."

In the trial of the cause plaintiff did not offer the records of either of the mentioned physicians in evidence, or any of the records of the mentioned hospital.

By letter dated December 23, 1957, defendant returned to Midwest the check given for the premiums on these policies and declined liability, advising that it considered them void.

While plaintiff did not offer the Menorah Hospital records in evidence they were referred to in plaintiff's Proofs of Death, which were offered by plaintiff, and when defendant offered Exhibits 30, 31 and 32, plaintiff's counsel admitted that they were "exact photostatic copies of part of the records at Menorah Hospital pertaining to the hospitalization and treatment of Mr. Oscar Rose." The existence and correctness of such records being admitted, we may consider them in determining the issues presented.

The testimony of plaintiff's witnesses tended to show that during the period from January to March, 1957, Oscar Rose had twice been a patient at Menorah Hospital, Kansas City, Missouri, because of a state of depression caused by business matters. He was under the care of Dr. Louis Forman, a psychiatrist and specialist in nervous disorders. At the time he first entered the hospital he had become very depressed; he couldn't sleep, couldn't follow up on the daily routine, couldn't think through his problems. He acted like a beaten man. When he entered the hospital everything was removed from him which he might use in hurting himself. His wife was permitted to visit only on certain days. She saw no particular improvement during this period; he was still greatly upset, still did not have clearly a pattern for what he wanted to do next. After a short time, he was temporarily released and came home, in very much the same condition. After about nine days he re-entered the hospital. This time he was given many electroshock treatments. He seemed to get better gradually, and when he was discharged from the hospital in March he "seemed to have regained everything he had lost and more." During the summer of 1957, he seemed to be completely recovered.

During the first period of hospitalization beginning January 27, 1957, the diagnosis was "depressive reaction with marked restlessness." When he was readmitted on February 15 the diagnosis was depressive reaction, with outstanding symptoms of "agitation, insomnia, suicidal ideas."

Mr. Rose had been embarrassed in his hospitalizations by the precautions taken and he felt that it was a sign of weakness to be under the care of a psychiatrist. He told his wife about the suicide precautions taken on his admission to the hospital, which he resented very much. He also told her of headaches caused by the electroshock therapy he had received; "he was very well aware of everything."

Plaintiff's evidence further tended to show that about the middle or the latter part of October 1957, probably a little closer to the middle, Mr. Rose "began to seem more nervous and depressed, started out with kind of nervousness, and then as time went on, he began to get a little depressed and that kind of increased, you know, as time went on."

By the time the agreement for the purchase of the stock of Midwest had been concluded on October 28, 1957, Mr. Rose "had become very uncertain again, and very indecisive, and the complications of acquiring the business had been very difficult for him, and he was becoming very overwrought and nervous again." After the first week of November 1957, and, while he was President of the Midwest Company, he suddenly felt not sure of himself; he would question whether he had done the right thing, whether he was equipped to run the business and whether he had made a

mistake. "He tortured himself with those questions and once more became highly nervous, alarmingly nervous. * * * He had just lost confidence in himself again." He went to Dr. Shifrin who said he felt about all Rose needed was some rest. He felt he could build Rose up and restore him to his normal health again.

His final admission to Menorah Hospital was on November 23, 1957. His complaints on admission were listed as: "(1) Poor appetite (2) Weight loss (3) Worried about recent business venture." Diagnosis—"Depressive State." The record shows patient "has become extremely tense and anxious over a new business venture"; and that "On the morning of death—patient had been notified that perhaps a new psychotherapist would be secured—that afternoon he hung himself", November 29, 1957.

Other facts will be stated in the course of the opinion.

As stated, appellant contends that no case was made for the jury, because Rose was not in sound health on November 26 and 27, 1957, but was suffering from the condition which shortly thereafter caused his death. Appellant cites Kirk v. Metropolitan Life Ins. Co., 336 Mo. 765, 81 S.W.2d 333 and Tarzian v. Metropolitan Life Ins. Co., Mo. App., 160 S.W.2d 490. Appellant says it is not important which of the two dates is used for this purpose, since respondent concedes that Rose was in unsound health on both of them and that the disease or condition from which he was then suffering caused his death on November 29. Appellant insists that these facts were clearly established by respondent's own evidence; that the Proofs of Death, executed by respondent and Midwest and placed in evidence by respondent, included statements by the doctors showing that Dr. Forman had attended Mr. Rose *in his last illness* on October 23, and that Dr. Shifrin had attended Rose *in his last illness* on November 23; that Dr. Shifrin's statement further shows that Mr. Rose's state of anxiety with depression was the disease or condition directly leading to death and that this condition had preceded Mr. Rose's death on November 29, in the doctor's words, for "several weeks." Appellant says that these statements in the Proofs of Death are admissions by respondent; and that if not explained or contradicted they are to be treated as true and given effect accordingly.

Respondent's only reply to this argument is that the defense was waived. Respondent says: "The sole theory of recovery advanced by plaintiff against the policy provision that the policies would go into effect when they were delivered while Mr. Rose was in good health was that such provision was waived." Appellant answers that "the evidence did not make a jury question on the issue of waiver" and that, if it did not, defendant was entitled to a directed verdict. Dickinson v. Bankers Life & Casualty Co., Mo.App., 283 S.W.2d 658.

In his petition, plaintiff alleged that "defendant with full knowledge of the facts, waived the right to deny liability, and is estopped to deny liability" on the ground that Rose was not in good health when the policies were delivered. Waiver was submitted to the jury by plaintiff's Instruction No. 4, as follows: "The Court instructs the jury that if you find and believe from the evidence that when the original two policies in evidence were delivered to Midwest Bolt and Supply Company on November 26, 1957, Oscar Rose was not in sound health and the defendant insurance company, by and through its agents, knew that Oscar Rose was not then in sound health, then the provisions of the policies of insurance that said insurance would not be in force unless said policies were delivered while Mr. Rose was in sound health were waived by defendant insurance company and constitute no defense in this suit." No error is assigned on the giving of this instruction, but, as stated, appellant's theory is that no case was made for the jury.

As stated, appellant contends that no case of waiver was made for the jury because (1) Cochran and Lowry "had no actual

or apparent authority to waive the sound health requirement"; (2) plaintiff was bound by provisions 2 and 4 of the applications, as hereinbefore set out, and (3) Cochran and Lowry didn't know the true condition of Rose's health and without knowledge thereof and without an intention to waive could not have waived the sound health provisions. Appellant proceeds on the theory that "waiver", as here used, means "implied waiver" and "the intentional relinquishment of a known right." Lucas Hunt Village Co. v. Klein, 358 Mo. 1054, 218 S.W.2d 595, 599(8, 9). Respondent proceeds on the theory that an intention to waive is unnecessary where waiver is based on estoppel. See State ex rel. Mutual Life Ins. Co. v. Shain, 339 Mo. 621, 98 S.W.2d 690, 692; Friedman v. Maryland Casualty Co., 228 Mo.App. 680, 71 S.W.2d 491, 502.

Appellant insists that Sheffrey, Midwest's secretary to whom the policies were delivered, knew of the provisions of the applications and of Cochran's and Lowry's want of authority, and that he could not rely on the apparent authority of defendant's agents. Sheffrey admitted that, *after the original policies* (the applications for which had been signed by Rose on October 29, 1957) *had been delivered,* he (Sheffrey) did discuss with Cochran the terms and provisions of the application forms with regard to sound health; and that, when the substitute policies were ready for delivery on November 27, 1957, he (Sheffrey) signed similar application forms "as a matter of course" on behalf of Midwest, prior to the delivery of the substitute policies. There was evidence that Sheffrey did not know of the non-waiver (home-office endorsement) provision of the application, or of any restrictions on the scope of the apparent authority of the general agent to waive the sound health provision of the application when the original policies were delivered. Absent such knowledge he could rely on apparent authority. If respondent's theory of waiver by estoppel is sustained by the evidence, the insurance on the life

of Mr. Rose was in force and effect prior to the execution of the new applications executed in pursuance of the agreement for the substitution of new policies, which were intended to meet objections to the form of the original policies.

Appellant further contends that plaintiff's "attempt to prove waiver violated the parol evidence rule," because plaintiff was attempting to prove by parol evidence that Cochran had authority to waive a printed provision of the applications and by so doing was attempting to directly contradict the terms of the written agreement sued on. No issue as to the erroneous admission of evidence is presented by the record or appellant's brief.

■ The evidence was sufficient to show that Cochran and Lowry were the general agents for defendant in Kansas City and that defendant's home office was in St. Louis. These agents of defendant handled the original applications for insurance and requested the appointment of Dr. Shifrin as special examiner for defendant to make the physical examination of Mr. Rose. The policies, when issued in St. Louis were sent to these agents in Kansas City for delivery and the collection of premiums. Their authority to deliver the policies and collect the premiums is not questioned. When Mrs. Rose was contacted, Mr. Rose was in the hospital, and agent Lowry was referred to Sheffrey. When Lowry sought to deliver the policies, he was advised that Rose was in the hospital with a "nervous breakdown." Lowry then consulted Dr. Shifrin who had made the examination for defendant. Lowry also reported the matter to his associate Cochran. Cochran and Lowry had the policies for delivery in Kansas City. Defendant was a corporation, it had to deal through agents. Cochran, in the presence of Sheffrey, contacted the home office by telephone with reference to the correction and reissuance of the policies, prior to Sheffrey's acceptance of the original policies. Amended policies conforming to the arrangement were sent to.

Cochran and Lowry. Cochran and Lowry had apparent authority to deliver the original policies and to collect the premiums, which they did. They had apparent, if not actual, authority to substitute the amended policies. In the discharge of their duties, the evidence shows that Cochran and Lowry were advised of the condition of Mr. Rose's health. Their knowledge of the facts was the knowledge of the company and with the knowledge shown they delivered the policy and accepted the check in payment of premiums, thus effecting a valid contract. The evidence was sufficient to show that the agent that delivered the policies, and consequently the defendant itself, had knowledge of Mr. Rose's physical condition at the time the policies were delivered. The evidence was sufficient to show waiver, by estoppel, since defendant was bound by the knowledge of its agent and estopped thereby to assert its right under the sound health provisions contained in the application. See James v. Mutual Reserve Fund Life Ass'n, 148 Mo. 1, 49 S.W. 978, 980; State ex rel. John Hancock Mutual Life Ins. Co. v. Hughes, Mo.Sup., 152 S.W.2d 132, 134; Brabham v. Pioneer Life Ins. Co. of America, Mo.App., 253 S.W. 786, modified on other ground in State ex rel. Continental Life Ins. Co. of Kansas City v. Allen, 303 Mo. 608, 262 S.W. 43; Bell v. Missouri State Life Ins. Co., 166 Mo. 390, 149 S.W. 33, 34(4); Bohannon v. Illinois Bankers' Life Ass'n, 223 Mo.App. 877, 20 S.W.2d 950, 951; Thompson v. Traders' Insurance Co., 169 Mo. 12, 68 S.W. 889, 891; Block v. U. S. Fidelity and Guaranty Co., 316 Mo. 278, 290 S.W. 429, 435; Commercial Standard Ins. Co. v. Maryland Casualty Co., D.C., 147 F.Supp. 539, 543 (3); 32 C.J. 1135, Sec. 242; 44 C.J.S. Insurance §§ 275, 276, pp. 1091, 1103. The estoppel existed despite any provisions in the policies that the agents had no such power. Both plaintiff and plaintiff's assignor would be prejudiced if defendant were permitted to now change its position in the premises.

As to appellant's contention that Cochran and Lowry did not know of "the true condition of Rose's health," we may say that while some of plaintiff's evidence tends to show that defendant's agents refused to accept, or believe, Sheffrey's statement that Rose was in the hospital with a "nervous breakdown," it is clear that they failed to make any reasonable investigation to determine the true facts after having been put on notice of unsound health. Other evidence, however, indicates that such disbelief and failure to investigate on the part of defendant's agents may have been influenced by a desire to effect the insurance, collect the premium and obtain the benefit of a commission. We think the evidence sufficient to sustain a finding that defendant's agents were advised and knew that the insured was not in sound health prior to a delivery of the policies and the collection of the premiums.

As stated, appellant further contends that the court erred in refusing to direct a verdict for defendant on the ground that "the evidence clearly established violation by respondent's assignor of its duty to advise appellant of the knowledge of Rose's condition of health acquired on the morning of November 27, 1957," which knowledge appellant says rendered the policies void. This was subsequent to the delivery of the original policies. Appellant says the evidence shows that, after talking with Dr. Shifrin, Cochran and Lowry had concluded that there was nothing seriously wrong with Rose and that the policies could, therefore, be delivered; that the original policies issued to Rose were then delivered to Sheffrey with the understanding that replacement policies issued to Midwest would be secured and exchanged therefor; and that the original policies were delivered on November 26, and at about 8 o'clock the next morning Sheffrey and Mrs. Rose met with Dr. Forman for a conference about Mr. Rose's condition, prior to delivery of the replacement policies.

The evidence does show that Sheffrey admitted that, at 8 a. m. of November 27, he had been present in Dr. Forman's office and had overheard a discussion between Mrs. Rose and Dr. Forman wherein Mrs. Rose expressed dissatisfaction with the arrangement by which Dr. Shifrin was in charge of Mr. Rose; and that Dr. Forman had "suggested that it would be a good thing for Mr. Rose and Dr. Shifrin to select some other psychiatrist or psychologist to help Mr. Rose along out of his depressed state, and then Mr. Rose would feel that it was a doctor of his own, wholly his own selection. Also he recommended to Mrs. Rose that it would be best if Mr. Rose left the city and went some place else, because he said that here he is continuously bumping into his friends and they are always asking him, 'How do you feel?' and 'You ought to go see a doctor', and then Mr. Rose was a little bit embarrassed about going to a phychiatrist and thought people might think he was maybe a little bit off of the beam, and he thought that Mr. Rose would do much, much better if he went out of the city on a sort of a vacation, and that he would recover from his nervous condition and his depression much earlier." Sheffrey said that Dr. Forman described Mr. Rose's condition by saying "that he was very nervous, that he had anxiety, that he was not sure of himself, but mostly, his complaint was that he couldn't get Mr. Rose to talk to him very much." Sheffrey quoted Dr. Forman as saying Rose needed psychiatric attention; that Mr. Rose was depressed and was leaving town and going to one of several places; that mental sanitariums where people get psychiatric treatment were mentioned; but that the possibility of suicide was not discussed. Sheffrey knew that Dr. Forman was a specialist in nervous disorders, but on the afternoon of the 27th, when Sheffrey (for Midwest) signed the applications for the substitute policies, Sheffrey did not tell Mr. Cochran what he had learned from Dr. Forman in the morning, nor did he tell Cochran about the

conference. Sheffrey further testified: "I didn't learn anything different from Dr. Forman than I already knew."

Appellant concedes that the evidence shows that arrangements had been made in advance for securing the replacement policies and making the exchange. The evidence also tends to show the insurance on Rose's life was in effect by reason of the original application, the delivery of the original policies and the payment of premiums. No new medical examination of Rose was contemplated; no new or additional premiums were to be paid and no new questions were to be presented to either Midwest or Mr. Rose. The answers to the questions in the new applications had been filled in in defendant's home office in conformity to the prior application, and the understanding was that upon the signing of the amended applications by Rose and Midwest the exchange was to take place. Under all such circumstances we think the evidence insufficient to impose the claimed duty, as a matter of law, on plaintiff's assignor on the afternoon of November 27. The pertinent issues of fact were submitted to the jury by defendant's Instruction No. 13, which included a submitted finding "that the policies delivered on November 27, 1957, were not merely in substitution for the policies delivered on November 26, 1957."

Appellant further contends that the court erred in refusing to direct a verdict in its favor because the evidence established, as a matter of law, its right to avoid the policies for false and fraudulent misrepresentation concerning Rose's prior medical history and treatment. Appellant relies on the statement in the application dated October 29, 1957, wherein Mr. Rose stated that he had not had any mental disorder or other disorder of the brain or nervous system or symptoms thereof. Appellant insists that, as a matter of fact, earlier that same year Mr. Rose had been a patient for a total of forty days in the

psychiatric ward at Menorah Hospital; that suicide precautions had twice been ordered and suicidal ideas noted; and that he had received extensive psychotherapy, including ten electroshock treatments. Appellant says that Dr. Shifrin knew that Rose's negative· answer to the question about the mental disorders was not true, but he inserted it anyway; that there was no 'basis for disputing that the answers in the medical part of the examination were false; that these false answers were knowingly given and that they make a clear case of misrepresentation, which voids the policies, as a matter of law under the ·law of such cases as New York Life Ins. Co. v. Feinberg, 357 Mo. 1044, 212 S.W.2d 574; Emery v. New York Life Ins. Co., 316 Mo. 1292, 295 S.W. 571.

■ The difficulty with appellant's contention here lies in the fact that defendant called both Dr. Forman and Dr. Shifrin as its witnesses. Defendant's own evidence shows that its own examining physician had seen Mr. Rose getting electroconvulsive therapy in the hospital in February 1957. This witness said, "I don't know that he (Rose) suffered a mental disorder, per se, * * *. He suffered an emotional disorder. * * * It was mental illness. * * * I can't define mental disorder." Defendant's evidence further tended to show that Mr. Rose entered Menorah Hospital on January 27, 1957, to seek the help of a psychiatrist and that he received such help and was finally discharged from the hospital on March 16 and from office consultation on April 2, 1957. The testimony of these witnesses tended to show that anxiety reaction and anxiety state was more descriptive of Mr. Rose's condition. Both of these experts thought Mr. Rose suffered an emotional disorder and did not like to designate his condition as mental illness or mental disorder. Dr. Shifrin testified that the word "nervousness" mentioned in the medical report was a broad term covering the type of illness from which Mr. Rose suffered when he was in the hospital early in 1957.

Mr. Rose was always rational, he knew where he was, he recognized those about him, he was "never out of his mind" or mentally deranged. When Rose was discharged on April 2 he was considered virtually recovered from the acute agitated depression for which he had been hospitalized. The evidence shows his activities subsequent to April 2 and indicates complete good health and recovery, prior to the physical examination on October 29. In view of all of the evidence the question of misrepresentation was for the jury.

■ The misrepresentation statute, Section 376.580 RSMo 1949, V.A.M.S. provides that no misrepresentations made in obtaining a policy of life insurance by a citizen of this' state shall be deemed material or render the policy void, unless the matter misrepresented shall have actually contributed to the contingency or event on which the policy is to become due and payable, and whether is so contributed ·in any case shall be a question for the jury. Of course the power remains 'in the court to determine whether there is any evidence which authorizes submission of the case to the jury. Kirk v. Metropolitan Life Ins. Co., supra, 81 S.W.2d 333, 344.

On this record we must and do hold that the court did not err in refusing to direct a verdict for defendant.

Appellant further contends that the court érred in giving Instructions 1, 2 and 5, requested by plaintiff and in refusing Instructions 20 and 27 requested by defendant.

Instruction 1, after hypothecating certain facts, directed a verdict for plaintiff on both counts of plaintiff's petition " * * * unless you further find and believe from the greater weight of the evidence (1) that Oscar Rose made false representations in his application for insurance, and that defendant was entitled to rely thereon and did rely thereon, and that such false representations, if any, directly caused or contributed to the death of Oscar Rose,

or (2) that Oscar Rose was not of sound health when the policies were delivered, and that defendant did not know he was then in unsound health, or (3) that Oscar Rose, when he made application for the policies on or about October 29, 1957, intended or planned to commit suicide." (Numbering in parentheses is ours.)

Appellant says that the Instruction under (1) is clearly erroneous because "the misrepresentations could not have caused or contributed to Mr. Rose's death; and appellant was not claiming they did"; that the issue was whether or not the prior illness, the existence of which had been denied and the treatment misrepresented, contributed to Mr. Rose's death; and that the effect of the language used in the instruction eliminated the misrepresentation issue for all practical purposes.

█ Of course the fact that Rose made the questioned statements in his application (if misrepresentations) did not cause or contribute to his death, but the question for us is whether the wording of the instruction was misleading and would probably have been misunderstood by the jury, so that the jury would believe that the illness of which Mr. Rose suffered, when in the hospital in January and February 1957, about which the misrepresentations were allegedly made, was not to be considered as having caused or contributed to his death, or only that the representations, if false, caused or contributed to his death. We think the error was apparent on the face of the instruction; and that it was neither misleading nor prejudicial, particularly in view of the evidence, the arguments of counsel and defendant's Instructions No. 11 and 12. See Duffy v. Rohan, Mo.Sup., 259 S.W.2d 839, 841; Osborne v. Wells, 213 Mo.App. 319, 249 S.W. 705, 708.

█ Appellant further says that the instruction, under (2), undertook to submit the defense of waiver, but only covered knowledge and ignored "intention to waive." Appellant insists that knowledge alone does not establish "implied waiver," as the instruction assumes; and that the instruction was prejudicially erroneous in not properly submitting the "entire issue of implied waiver." This part of the instruction conforms to Instruction No. 4, to which no objection is made, and to the full submission of the mentioned defense by Instruction No. 14, hereinafter referred to. In any event this part of the instruction is not erroneous on the ground claimed, because waiver based upon an estoppel does not require an intention to waive, or a voluntary and intentional abandonment of a known right, so long as the acts upon which the estoppel is based are intentionally performed. See Schwab v. Brotherhood of American Yeomen, 305 Mo. 148, 264 S.W. 690, 692(1); State ex rel. Continental Ins. Co. of New York v. Becker, 336 Mo. 59, 77 S.W.2d 100, 104–105; Quirk v. Columbian Nat. Life Ins. Co., Mo.App., 207 S.W.2d 551, 555–556; Friedman v. Maryland Casualty Co., supra, 71 S.W.2d 491, 502.

█ The evidence in this case shows that defendant at its home office knew that the policies sued on were to be delivered and immediately assigned to plaintiff as collateral security for Midwest's indebtedness even before the policies sued on were prepared and mailed to Cochran and Lowry for the purpose of obtaining new signatures on the amended applications and for the purpose of exchange, all before the original policies were delivered and the check accepted in payment of premiums by defendant's general agent. Both Midwest and plaintiff were induced to and did change their position by reason of the delivery of the policies and the collection of premiums. While the check was returned on December 23rd uncashed, Midwest had kept sufficient funds in the bank for its payment from the time it was delivered. The waiver relied upon clearly involved an element of estoppel. By the delivery of the policies and the acceptance of the check

the insurance became effective and Midwest was permitted to make the assignment to plaintiff. If defendant delivered the policies and collected the premiums with knowledge of the unsound health condition the provision was waived. We do not find the instruction erroneous in the respects claimed.

■ Appellant also insists that the instruction, subdivision (2), is erroneous in submitting the issue of unsound health because plaintiff's own evidence conclusively established and plaintiff has admitted unsound health when the policies were delivered; and that it was necessarily prejudicial to submit the issue of sound health when "all of the evidence" showed unsound health. Unsound health on November 26 or 27 was not an admitted or conceded fact during the trial of the cause; nor when Instruction 1 was given. Appellant only refers to statements by counsel in argument to the jury, which statements when considered in context are somewhat ambiguous. Plaintiff's theory was that even if unsound health existed, the defense was waived. The assignment is overruled.

Appellant contends that Instruction No. 2 was prejudicially erroneous in submitting whether or not unsound health existed on April 2, 1957, "a date totally irrelevant to the unsound health defense" and, therefore, the instruction was misleading and confusing. Instruction 2 was as follows:

"The Court instructs the jury that, even if you find and believe from the evidence that on or about April 2, 1957, Dr. Forman discharged or ceased to treat Mr. Rose; and at that time Mr. Rose was not abnormally nervous, depressed or affected with anxiety, and that he was physically in sound health; and if you further find that he had a personality defect consisting of a passive, indecisive, unaggressive, easygoing personality, and found it difficult to face up to problems and decisions on his own, and that such personality defect made it more likely that he would sometime in the future get into a mental or emotional

state which would cause him to commit suicide, then you cannot find that such personality defect, if you find it then existed, constituted unsound health within the meaning of the policies or within the meaning of the application therefor."

■ There is no suggestion that the instruction was not fully supported by the evidence. We think the instruction purely cautionary in nature in advising the jury that a personality defect, existing on April 2, 1957, if found, did not constitute unsound health at the time of the delivery of the policies; and that it was insufficient to sustain the defense of misrepresentation in the application for the policies. The instruction excluded "a personality defect" in April 1957 from being considered unsound health, or as supporting the misrepresentation defense. The court by Instruction 3, also told the jury that the words "sound health" as used in the policies of insurance in evidence and in the applications therefor refer to "sound health" as those words are understood in the common speech of men. We do not find Instruction 2 prejudicially erroneous.

The assignments of error on the giving of Instruction 5 and the refusal of Instruction 20 will be considered together. Instruction 5 dealt with the issue of misrepresentation as to whether Rose had a mental disorder or symptom thereof. It submitted the facts reported in the application as to Rose's illness and hospitalization in February 1957, describing his illness as "nervousness" and authorizing or requesting any hospital or any doctor who attended, examined or treated him to furnish information as to his health, the instruction then advised the jury that "if you find and believe that Oscar Rose's answers, as a whole, provided sufficient information to put defendant company upon inquiry *and that the inquiry indicated by such answers,* if pursued by defendant company, *would have revealed the truth concerning the nature of Mr. Rose's condition* when he was confined in the hospital

prior to the date of his application for insurance, then you cannot find against plaintiff on the ground that he answered that he had never had a mental disorder." (Italics ours.)

Instruction 20 offered by defendant dealt with the issue of waiver and advised the jury that they could not find waiver unless "Cochran knew that Oscar Rose was then in unsound health." The instruction was amended by the court, and as given, read that said Cochran "either had substantially complete and accurate information that Oscar Rose was then in unsound health or had sufficient information to put him on notice that he should make further inquiry which would have disclosed the information that Oscar Rose was in unsound health."

Appellant says that Instruction 5 was erroneous and prejudicial because it would excuse an intentionally false answer so long as there was any information in the application to suggest that such answer was false and that further inquiry would disclose the truth.

As to Instruction 20, appellant says that by requiring the issue of knowledge to be submitted in the form to which Instruction No. 20 was amended and thereafter given, as Instruction No. 14, the court made an erroneous statement of law and charged Cochran with not only what he knew about Rose's condition, but also with what he could have learned if he had made further inquiry. Appellant says that waiver requires *actual knowledge of the unsound health* which was claimed to have been waived; and that the portion requiring further inquiry was clearly erroneous. We think appellant misconstrues the terms of the instructions. Appellant cites Guenther v. Metropolitan Life Ins. Co., Mo.App., 189 S.W.2d 126, 128; Kirk v. Metropolitan Life Ins. Co., 336 Mo. 765, 81 S.W.2d 333, 339. Respondent's theory is supported by Brummer v. Nat. Life & Accident Ins. Co., Mo.App., 59 S.W.2d 781, 786 (4, 5); Loduca v. St. Paul Fire & Marine

Ins. Co., Mo.App., 105 S.W.2d 1011, 1013 (2, 3); Reithmueller v. Fire Ass'n of Philadelphia, 38 Mo.App. 118, 129.

The Brummer case held that if the insured informed insurer's examining physician of an abscess in insured's back when applying for a life policy she did enough to put the physician on notice without referring to the ailment by its technical medical name. The Guenther case held that actual knowledge on insurer's part of the true condition of insured's health was necessary to a waiver of the sound health representations and held that a reasonable construction of the Brummer opinion did not conflict with the following holding, to wit: "And while such knowledge may be shown either by direct or circumstantial evidence, that is, from such state of facts that a reasonable inference arises of actual knowledge, nevertheless in the final analysis the knowledge attributable to the insurance company must be actual knowledge and not what might have been discovered and become actual knowledge if a further investigation had been made." 189 S.W.2d 126, 128(3).

The Guenther case proceeds on the theory that "a waiver is the intentional relinquishment of a known right with both knowledge of its existence and intention to relinquish it", and, as stated, holds that waiver cannot rest upon what a party could have known by further investigation, even if defendant were put on notice and inquiry. The issue of waiver by estoppel was not considered. The Kirk case is not decisive of the issues here. We think the court in the Guenther case too narrowly construed the meaning of the word "knowledge." Knowledge may be imputed when a party is put on notice and inquiry and the means of knowledge exists, known and accessible to such party, and capable of communicating positive information. This Court has held that "actual notice often means knowledge of facts and circumstances sufficiently pertinent in character to enable reasonably cautious and prudent

persons to investigate and ascertain the ultimate fact." Shaw v. Butterworth, 327 Mo. 622, 38 S.W.2d 57, 62. And see discussion of the term "knowledge" in State v. Ransberger, 106 Mo. 135, 17 S.W. 290, 291; 51 C.J.S. 465.

■ ■ The application for insurance showed that Rose had been hospitalized and that he had consulted Dr. Louis Forman for "nervousness", duration three weeks in February 1957. Defendant's examining physician had seen Mr. Rose getting electroconvulsive therapy in the hospital in February 1957. "Nervousness", as mentioned in the application, is clearly a very broad, general description for an illness that required hospitalization. Defendant's general agents were advised on November 25 and 26, 1957, that Rose was in the hospital with "a nervous breakdown." Again, a very broad, general term was used in association with hospitalization. This information demanded reasonable inquiry. Dr. Forman was not consulted, nor the hospital contacted, nor its records examined. Defendant relied upon the statements of its own examining physician who was known to be Rose's personal physician. The purpose of making inquiry of Dr. Shifrin on November 25th was not disclosed to him. Under a favorable view of the facts and circumstances shown, defendant had sufficient knowledge of the facts concerning Rose's health condition to fully sustain the mentioned instructions and, when defendant elected to deliver the policies and collect the premiums, a case of waiver by estoppel of the right to contend the policies did not go into effect was made for the jury. We hold that Instruction No. 5 was not erroneous, as a matter of law; and that the court did not err in refusing Instruction No. 20 in its original form.

■ Appellant's final assignment is that the court erred in refusing Instruction No. 27, offered by appellant, which would have instucted the jury that Mr. Rose was not in sound health on November 26 and 27, but was then suffering from the condition which thereafter caused his death. Appellant says that these facts were clearly established and there was no conflict of the evidence in regard thereto; and that the instruction would have submitted facts conclusively shown by respondent's own evidence, including the admissions in the Proofs of Death, and conceded by respondent in argument to the jury. Respondent replies that, "It is true that the facts which the instruction would have told the jury were undisputed, but that is the very reason why the court was not required to so tell the jury." However, no such admission appeared in the record when the instruction was refused. Appellant does not point out wherein or why it was prejudicial error to refuse the instruction, but only says the instruction was supported by evidence and that, "It was prejudicial error to submit these two issues to the jury (unsound health on November 26 and 27, 1957, and that the mentioned illness caused death), thereby permitting the jury to speculate on factual questions which admitted of only one answer." (Parenthesis ours.) The instruction which was refused would not have done either of these things. The mentioned issues were submitted by other instructions. The instruction would have told the jury that Rose was not in sound health on November 26 and 27, 1957, but was "suffering from a mental condition known as anxiety state with depression"; that "said mental condition * * * caused or contributed to his death"; and that, unless the jury found waiver "in accordance with other instructions", the policies never took effect and the verdict should be for defendant. We think that, on the record, unsound health was a fact issue; in any event the court did not err in failing to declare it as a matter of law. The other matters mentioned were sufficiently covered by other instructions. The court did not err in refusing the instruction.

The judgment is affirmed.

All concur except HYDE, J., who concurs in result.

On Motion for Rehearing or to Transfer to Court en Banc.

PER CURIAM.

Appellant does not question the statement of facts in the opinion, nor suggest that the evidence was not entirely sufficient to sustain a finding that Cochran and Lowry were held out as the general agents of defendant (see the original application on which the first policies were issued), nor contend that, as such, the agents did not have the apparent authority to waive the sound health provision of the policies in dealing with one who had no knowledge of any restrictions on their apparent authority.

 Appellant first contends the opinion is erroneous in holding that, on November 26, when the original policies were delivered to Sheffrey (Midwest's Secretary), "he had not yet received actual notice of limitations on Cochran's authority." Appellant contends that the record shows that Sheffrey had knowledge of said limitations before the delivery of the first policies. In support of this contention appellant quotes certain excerpts from Sheffrey's testimony and then construes Sheffrey's testimony as conclusively admitting that Cochran read the "non-waiver provision" or "home office endorsement provision" of the application to him (Sheffrey) before the original policies were delivered. However, in determining whether a fact issue was presented for the jury in order to rule the defendant's motion for a directed verdict, we must consider the evidence in a light most favorable to plaintiff. Sheffrey repeatedly stated that any discussion of any part of the application form was *after* the first policies were delivered. Only by inference can a conclusion be drawn that the non-waiver provision, paragraph (2), was discussed at any time. The sound health paragraph was paragraph (4). Sheffrey was cross-examined "about the clause preceding the applicant's signature." This was not paragraph (2), the non-waiver or limitations of authority paragraph. Sheffrey's testimony must be considered as a whole and when so considered, we think a question of fact was presented as to whether Sheffrey had actual notice of the non-waiver provision of the policies and whether a similar non-waiver provision was read to him prior to the time he accepted delivery of the original policies on behalf of Midwest. We cannot determine the issue in appellant's favor as a matter of law by accepting an unfavorable view of Sheffrey's testimony, nor by ruling the issue on the weight of the evidence as appellant apparently would have us determine the matter. State ex rel. Kansas City Public Service Co. v. Bland, 353 Mo. 1234, 187 S.W.2d 211, 214(5, 6).

 Appellant next contends that the opinion entirely overlooks the fact that, even if Sheffrey had not received actual notice of the limitations on Cochran's authority at the time of the delivery of the original policies, Rose, as President of Midwest, had received actual notice of the limitations upon Cochran's power to waive the sound health provision when he, Rose, signed the application for the original policies on October 29. We do not find this issue to have been presented in the original brief, that is, that Rose was President of and representing Midwest at the time he signed the original application for the policies on October 29, 1957. This contention is not supported by the record. The record does not show when Rose became President of Midwest. It does appear from the Collateral Trust Agreement, dated November 1, 1957 (to which agreement Midwest was not a party), that Rose and wife agreed with Mrs. Bowersock that Rose would "promptly cause Midwest to obtain new life insurance upon the life of Oscar Rose * * *" (more fully stated in the opinion). It also appears that Rose and wife had, on October 28, 1957, contracted to purchase from Mrs. Bowersock certain shares of stock in the Midwest Corporation, but Midwest was not a party to either of these contracts. Nor does the record show when the stock was assigned to Rose, but the stock purchase contract contained a provision for closing

on October 31, 1957. Midwest was not mentioned or referred to in the original application for insurance signed by Rose on October 29. Accordingly, it appears that Rose was not even a stockholder in Midwest when the original application for insurance was signed. On this record, an inference cannot be drawn that Rose was President of Midwest on October 29, 1957, from the proven fact that he was President of Midwest on November 27, 1957. The evidence will not support an inference that such fact existed on a prior date as the inference will not run backward. State v. Smith, Mo. Sup., 300 S.W. 1081, 1082(1). Further, there is no evidence in the record that Midwest (to whom the new policies were delivered on November 27, 1957) had authorized Rose to make the original application, dated October 29, since Rose was not then a stockholder, an official or the President of Midwest at that time. So far as the record shows, Midwest's first dealings with defendant came about through Sheffrey's arrangement with Cochran and defendant's home office for the exchange or substitution of new policies on November 26, 1957. While Rose in his personal capacity had acquired constructive notice of the limitations on Cochran's authority, as set forth in the application which he signed on October 29, the policies were never delivered to Rose, nor did he pay the premiums. The arrangement of November 26 was between Cochran, Sheffrey and defendant's home office for the issuance of new policies, which were delivered to Midwest *after* the original policies had been delivered to Sheffrey, Secretary of Midwest, on November 26. We must, therefore, reject appellant's conclusion that, under the law of agency Midwest, through Mr. Rose, had knowledge of the limitations upon Cochran's authority on October 29, 1957, and could not be ignorant of the same on November 26. Midwest was not concluded on the mentioned issue by Rose's application made in his personal capacity on October 29. No issue as to ratification or adoption was presented by the pleadings or submitted to the jury.

Appellant next contends that the opinion overlooks the fact that if Sheffrey did not have actual notice of the limitations upon Cochran's authority at the time the original policies were delivered, nevertheless the delivery of the application for the new policies to Sheffrey and to Rose and the delivery of the second (substitute) policies, which were issued to Midwest were *all a part of one transaction* at which Sheffrey did gain actual notice of the limitations of Cochran's authority.

This assignment represents a change from appellant's position when the cause was submitted on appeal in this Court. We find no suggestion in the original brief that both deliveries were *all a part of one transaction*. This assignment was inspired no doubt by our holding that the insurance on the life of Oscar Rose became effective on November 26, 1957, and remained in effect regardless of the exchanges or substitutions on November 27, by which the policies were made to conform to what Sheffrey said had been intended by this company as to ownership and name of beneficiary. Appellant now argues that Midwest, through Sheffrey, must be deemed to have accepted them (the original policies) as written, and that *by accepting them* Midwest at that time acquired constructive notice of and must be deemed to have agreed to all of the terms and conditions thereof, including those which stated that Mr. Rose must be in sound health for the policies to take effect and that an agent such as Cochran could not waive that prerequisite to liability or bind defendant by his contrary knowledge. This new theory approaches ratification which was not pleaded or submitted. Appellant further says: "Our point is that the contract documents Sheffrey accepted expressly negatived that authority, and plaintiff should certainly not be heard to say that he and his assignor were not bound thereby." No authorities are cited in support of this new position with reference to the original policies, which were taken up and cancelled when the new policies sued on were delivered.

We have seen that a favorable view of the evidence shows that Sheffrey had no knowledge of the mentioned restrictions on Cochran's apparent authority when he accepted the policies.

Appellant next contends that, "the opinion on file overlooks the fact that plaintiff abandoned any claim of estoppel (or waiver by estoppel) in the trial court, no facts supporting the same and no instructions on that theory having been submitted to the jury." Appellant argues that "while plaintiff did use the word 'estoppel' in his petition, the case was tried and submitted to the jury on the usual theory of implied waiver"; that plaintiff abandoned any claim of waiver by estoppel; that not one of the elements of estoppel was submitted to or passed on by the jury; that whether there was any evidentiary basis upon which to base an estoppel was not a pertinent inquiry; and that the court should reconsider the question of whether or not estoppel, or waiver by estoppel, has any place in the opinion.

The facts reviewed in the opinion appear in the record. Only waiver was submitted, but it was waiver in the nature of estoppel. When the policies were delivered and the check of Midwest accepted for the premiums, defendant knew that the policies were to be assigned to plaintiff as security for the indebtedness due from Midwest to Mrs. Bowersock. The facts as to the delivery of the policies and the issuance of a receipt for the premiums were shown by both oral and documentary evidence. These facts were not in dispute and could be assumed by the court in giving Instruction No. 4. As stated, the waiver here submitted was in law based upon estoppel. There was no submission here of an intention to voluntarily waive a known right, but only waiver on the facts submitted, waiver by estoppel. Defendant's Instructions 10, 11 and 12, submitting the respective defenses of unsound health, false representations and wilful concealment and directing a finding for defendant, each included a required finding that there was no waiver of the defense, or right to rely, etc. before directing a finding for defendant.

Appellant next reargues its assignment of error with reference to the refusal of Instruction No. 27, which assignment was ruled on the basis that "unsound health was a fact issue"; and that unsound health on November 26 and 27 was not an admitted or conceded fact during the trial of the cause. Appellant says the opinion overlooks evidence and admissions from which the conclusion should have been drawn, as a matter of law, that Rose's unsound health was an admitted fact. Appellant reviews the evidence tending to show unsound health, but not the evidence of its own witnesses on cross-examination from which the jury might have drawn a contrary conclusion. The issue was not concluded by the pleadings or by any stipulation. Appellant relies primarily on statements in the closing argument of plaintiff's counsel and upon the admissions in respondent's brief filed in this Court to establish error of the trial court in the refusal of Instruction No. 27. We have ruled the issue of error on the way the matter stood in the trial court (as shown by the transcript presented), when Instruction No. 27 was refused. This Court is not concluded by respondent's argument in this court that it could not have been error to *fail* to tell the jury that Rose was in unsound health on November 26 and 27 because the matter was "never in dispute." However, if appellant is correct in its contention that it was clearly admitted by the plaintiff in his opening statement and in his closing argument to the jury that Rose was of unsound health when the policies were delivered, it is difficult to understand how defendant could have been prejudiced by the court's failure to give Instruction 27.

In any event, it could not be reversible error for the trial court to refuse an instruction to the effect that "all the credible evidence of both plaintiff and defendant shows that at the time of the premium

payment on November 26, 1957, and at the time of the delivery of the policies in suit on November 27, 1957, the proposed insured, Oscar Rose, was not in sound health but was suffering from a mental condition known as anxiety state with depression * * *." There was evidence before the jury from which a contrary conclusion could be drawn. One witness quoted appellant's examining physician as stating on November 26, that Rose was in good health and that he was in the hospital for a rest. Defendant's examining physician (if one is to pick and choose statements) testified that he felt that Rose "being tense had nothing to do with his physical condition." "It was an emotional upset." "When I examined him his physical condition was excellent." Defendant showed that Dr. Shifrin told Lowry that Rose had nervous exhaustion, but was in perfect physical condition and only needed a rest. Mrs. Rose testified that Dr. Shifrin said "he felt about all Rose needed was some rest. He felt he could build Rose up and restore him to his normal health again." On the record the trial court could not be convicted of error in not disposing of the issue as a matter of law.

■ Appellant next argues that, even if the insurance was in effect on the life of Rose by reason of the delivery of the policies on November 26, 1957, at a time when Sheffrey had no notice of the non-waiver provision of the policies and if the sound health provision had been waived, nevertheless, when Sheffrey, as Secretary of Midwest, and Rose signed the amended applications on November 27, for the substitute policies, Rose and Midwest then obtained knowledge that Cochran and Lowry had no authority to waive the sound health provision of the policies.

But, if the sound health provision had been waived the day before, when Midwest had no knowledge of the non-waiver or limitations of authority provision and the insurance went into effect, the waiver of unsound health remained in full force

and effect. As stated in the opinion, the insured was not re-examined and no additional premium was to be collected. The insurance was to remain in full force and effect with only a change in ownership of the policies and a new beneficiary designated. Such was the intention of the parties as shown by the evidence. No question of successive waivers is involved. Instruction No. 4 specifically submitted waiver on November 26, 1957, and no error on appeal is assigned to the giving of that instruction. Appellant, in effect, recognizes the fact that, if there was no actual or constructive knowledge of the non-waiver provision and if there was waiver of unsound health on November 26, 1957, the defendant is concluded by delivery of the policies, since appellant now argues that Midwest and plaintiff (by mere acceptance of the policies) are bound by the non-waiver provision of the *original* application, which was *not* signed by any then stockholder, officer or agent of Midwest. If there had been waiver of the sound health provision, such provision could not be reinstated after the waiver had been consummated, the policies delivered and the insurance put into effect.

In the final portion of its motion for rehearing, and on the basis of the foregoing contentions, appellant insists that the opinion overrules the established law as to "the right of an insurance company to limit the authority of its agents by written contract with the insured." We do not so construe the opinion. Respondent further construes the opinion as holding "that retention of a premium check for less than a month, while the company is investigating a serious question of liability, creates an estoppel to deny liability as a matter of law." No such holding appears in the opinion. Appellant's offered Instruction No. 27 recognized payment of premiums on November 26, 1957. The opinion discloses that plaintiff's instructions submitted the issue of waiver by defendant as having occurred on November 26, 1957, which is the day the original policies were delivered

and the receipt signed acknowledging payment in full of the first year premium on the above policies. On a favorable view of the evidence, as reviewed in the opinion, the holding is that plaintiff made a case for the jury. We do not find the opinion to be in conflict with any controlling authorities.

Appellant in conclusion insists that misunderstanding and confusion will result because of conflict between this decision and the decision in Summers v. Prudential Ins. Co., Mo.App., 337 S.W.2d 562; Zielinski v. General American Life Ins. Co., Mo.App., 96 S.W.2d 1059; and Voss v. American Mutual Liability Ins. Co., Mo. App., 341 S.W.2d 270, 271. However, no policy of insurance was issued or delivered in either of those cases. The facts upon which those cases were decided are not similar to the facts in evidence in this case. The issues presented and considered are not similar. The cases have no application here.

The motion for rehearing or to transfer to Court en Banc is overruled.