D. J. MAHN and Gerald J. Mahn, d/b/a Mahn Funeral Home, Plaintiffs-Respondents,

v.

AMERICAN LIFE & ACCIDENT INSURANCE COMPANY, Defendant-Appellant.

No. 31901.

St. Louis Court of Appeals.

Missouri.

April 20, 1965.

Motion for Rehearing or for Transfer to Supreme Court Denied May 14, 1965.

Application to Transfer Denied June 14, 1965.

574

Roberts & Roberts, Raymond R. Roberts, Farmington, for defendant-appellant.

Earl R. Blackwell, Hillsboro, for plaintiffs-respondents.

BRADY, Commissioner.

This is an action on a life insurance policy whereby the defendant insured the life of Annie Fowler in the sum of $500.00. The named beneficiary was her husband who assigned all of his interest in the policy to the plaintiffs. Jury trial resulted in a verdict for the plaintiffs and the defendant has perfected this appeal.

The petition alleged that in consideration of the payment of the premium the defendant had executed, issued and delivered a policy of insurance on the life of the deceased; that the assured's death took place while the policy was in force and effect; and that the defendant was indebted to the plaintiffs in the amount of the policy but refused to pay the same. In its answer the defendant pleaded " * * * that said applicated (sic), dated June 11, 1962, states that Annie Fowler was in good health on that date and that Annie Fowler had had no illness, injury or accident within the past five years; that said Annie Fowler had never had any heart disease or any other illness or disorders of the nervous system, all of which statements the said Annie Fowler knew were untrue and that Annie Fowler knew that she had been in a hospital within the last five years suffering from an acute heart attack, that she was

not in good health at the time the policy was delivered * * *." Mrs. Fowler died in December of 1962. The policy was dated June 18, 1962.

The deceased could neither read nor write. The questions from the application which are pertinent to this appeal were read to her by the defendant's agent, and he wrote her answers down on the application. The pertinent questions and answers are as follows: " * * * 'Are you in good health?', and her answer was yes. * * * 'What illness or accident have you had in the last five years?' the answer was 'None'. * * * 'Have you ever had heart disease, * * * or any illness or disorder of the brain, lungs, spine, or nervous system?' answer is 'No'." The policy provided that: "12. POLICY EFFECTIVE. This policy shall take effect when the first premium is paid to the Company at its Home Office in St. Louis, Missouri, and when the application is thereafter considered and approved as of the date and time evidenced by the Company's official receipt for the first premium; *provided the Insured shall at that time be alive and in the same condition of insurability as warranted in his application to the Company.*" (Emphasis supplied.) Shortly over six months after the issuance of the policy, Annie Fowler died, and this action arises from efforts to recover on the policy.

Certain hospital records were introduced by agreement of the parties and from them it appears that the deceased had been hospitalized from April 24 to May 6, 1959, and from June 18 to July 4 of that same year. It also appears from those records that the diagnosis on each occasion was coronary insufficiency. On the occasion of her first admission the hospital record stated: " * * She is taking heart medicine which is reported to be nitroglycerin suppressing arteriosclerotic heart disease. * * *" On the second occasion the hospital record contained the following statements: " * * * The patient has a history of high blood pressure for a long time and coronary attack several times. Examination of patient reveals a large heart which is regular and pulse is weak and irregular B P * * *."

A Dr. Brennan examined the deceased in September of 1962. He stated that " * * she had had sometime before a coronary occlusion." He found her to have cerebral arteriosclerosis. Dr. Brennan stated that lobar pneumonia was the direct cause of death, but he also testified that the condition of arteriosclerosis which he found would contribute to cause her death and explained his statement in the following manner. The development of arteriosclerosis caused a psychotic reaction creating a catatonic state in which the deceased did not eat. As a result of her not eating her resistance was lower, and this caused her to be more susceptible to the lobar pneumonia which caused her death. The doctor also testified that he signed the death certificate noting in Part I thereof the immediate cause of death as lobar pneumonia. Part II of that certificate provided a space for him to note "other significant conditions contributing to death but not relating to the terminal disease condition in Part I." There the doctor wrote the word "arteriosclerosis."

The trial court gave Instruction No. 1 at plaintiffs' request. That instruction requires the jury to find that the defendant issued and delivered the policy in question for a specified premium naming the plaintiffs' assignor as beneficiary; " * * * and while said policy was in effect, * * *" the assured came to her demise; that the defendant was duly notified of her death; and that the plaintiffs were assignees of the beneficiary of the policy. Upon these findings the jury was authorized to return the verdict in favor of the plaintiffs and against the defendant.

During closing argument plaintiffs' counsel stated: " * * * They get those old people down there on a pension * * *." The defendant objected that this was outside the evidence. On another occasion the following occurred: "Mr. Blackwell: I said this jury has a right to infer they never do want to pay on any policy. * * *

Mr. Roberts: Your Honor, that's highly prejudicial." In reply the court instructed this jury: "* * * ladies and gentlemen you have to be guided by the evidence as you heard it from the stand and the instructions the Court's given to you." On another occasion the plaintiffs' counsel argued that based on the premiums of $40.43 a year that if the assured lived twenty years the company would have collected $800.00 plus interest and that when the assured died, the company might contest the payment under the policy, but if they don't, they are only paying out $500.00. Defendant objected and asked that the jury be instructed to disregard such argument. Plaintiffs' counsel also made the following statements during closing argument: "Then she ups and dies well, it turned out it wasn't such a good deal, I guess, and now they start looking around for reasons why they shouldn's (sic) have to pay it. * * * And this poor old gal couldn't even read or write and I'll venture to say that she was like all the rest of them who were run through that machine down there, probably wasn't even asked these questions." On each occasion the defendant objected stating that there was no evidence to warrant such accusations of bad faith on its part.

We must first ascertain the effect and reading to be given paragraph 12 of the policy. "Good health" provisos in life insurance policies are valid and are generally considered conditions precedent to the policy's becoming effective. 29 Am.Jur., Insurance, Sec. 223, n. 17; 44 C.J.S. Insurance § 271. In the instant case paragraph 12 is somewhat broader than the usual such proviso. It is not limited to the assured's condition upon delivery of the policy and uses the word "insurability." In the latter respect paragraph 12 is similar to the proviso found in the policy involved in Minzenberg v. Metropolitan Life Ins. Co., 157 Pa. Super. 557, 43 A.2d 377. In the instant case, by conditioning the effectiveness of the policy upon the assured's being " * * * in the same condition of insurability as warranted in his [her] application * * * " the

policy has incorporated the application. The result is that we are here concerned not only with an alleged violation of the "good health" proviso as raised by the question, "Are you in good health?" and the answer "yes" as found in the application. Here all three questions asked the assured as set out earlier herein become pertinent. However, this does not change the essential character of paragraph 12 of the policy. It is still a "good health" or "sound health" proviso albeit an expanded one. That being so, the burden rested upon the defendant to prove its affirmatively pleaded defense under this provision of the policy. Snead v. Union Life Ins. Co., Mo.App., 340 S.W. 2d 184, 1.c. 187.

The defendant first contends that since compliance with paragraph 12 was a condition precedent to the creation of the contract, any misstatement of the true facts in the application with respect to the deceased's "insurability" will render the contract void. The plaintiffs contend that the defendant must not only prove the falsity of the statements made in the application but must go further and prove that the insured's uninsurability was caused by a condition which existed at the time the application was made and was present at the time the policy by its terms became effective as a valid contract and that it caused her death since the so-called "misrepresentation statute" applies, not only to misrepresentations in the application, but also warranties contained in the policy.

It has been said that the almost universal rule in all jurisdictions except Missouri is that the misrepresentations statutes of the various states are not applicable to conditions in the policy itself. See Chorney v. Metropolitan Life Ins. Co., 54 R.I. 261, 172 A. 392, involving a "misrepresentation" statute almost identical to § 377.340, RS Mo 1959, V.A.M.S., and see the Missouri cases collected in 100 A.L.R., beginning at page 367. It follows from a careful reading of those cases that regardless of the rule in other jurisdictions, in Missouri

"good health" conditions are subject to our "misrepresentation" statute, § 377.340, supra. We therefore must rule this point in favor of plaintiffs.

On its face the policy states that it is issued in accordance with the provisions of § 377.200 through § 377.460, RSMo, 1949, V.A.M.S. § 377.340, supra, is Missouri's "misrepresentation" statute. In essence and read in the light of the facts of the instant case the effect of that section is that the defendant has the burden not only of showing the falsity of the answers given on the application but also of showing that those diseases from which the assured suffered at that time which she concealed from the company by any one or more false answers given on the application were present at the time the policy would by its terms become effective and actually caused or contributed to cause the assured's death.

■ The defendant's second contention is that its proof was that the assured had cerebral arteriosclerosis at the time she signed the application and also that this condition caused or contributed to cause the assured's death and that it was therefore entitled to a directed verdict. § 377.-340, supra, provides that the question of whether the misstated matter actually caused or contributed to cause the assured's death shall be for the jury. Of course, the power remains with the court to determine whether there is evidence which authorizes submission of that issue to the jury. Snead v. Union Life Ins. Co., supra, and cases cited 340 S.W.2d at [4, 5], p. 189.

We must rule against the defendant upon both points raised for the reason that under the evidence the question of whether the assured had cerebral arteriosclerosis at the time she signed the application or at the time the policy would by its terms become effective was for the jury. Dr. Brennan was asked if, from the nature of the cerebral arteriosclerosis he found assured to have upon admission to the hospital in September, he could tell how long she had had it and his answer was, "We could only summarize that from the history given us." He had earlier testified that the assured could not give a history due to her psychotic reaction. He did state that arteriosclerosis was a disease which would not have come on suddenly being a slow progressive thing that is present for some time. There is no evidence how long "some time" is or how slowly this disease develops either generally or specifically as to the assured. It will be borne in mind that we are to read the evidence in this cause in the light required of us by the fact the jury found in plaintiff's favor. When we do so, it is obvious that this is not evidence sufficient to authorize a directed verdict. We cannot presume the jury was composed of experts or even of those with experience in such matters. We must presume the jury was composed of men and women without any special training or experience but of average intelligence. We cannot say that upon hearing this evidence, the only reasonable conclusion that could be reached by a jury is that the assured did have cerebral arteriosclerosis at the time the policy would under its terms become effective or when she signed the application whether said statements in the application be regarded as warranties or mere misrepresentations.

■ Furthermore, it does not clearly appear that arteriosclerosis was a contributing cause of insured's death. Dr. Brennan, testified that with lowered resistance a person is more prone to contact lobar pneumonia; that in insured's case her resistance was lowered by arteriosclerosis, but also stated that "anybody can get it," which of course is common knowledge, since lobar pneumonia is an infection of the lungs which may attack a person in sound health where resistance has not been lowered by other ailments. Whether arteriosclerosis was a contributing factor to insured's death in the case at bar, was in our judgment, a jury question.

■ The defendant's third allegation of prejudicial error concerns the giving of Instruction No. 1. The defendant first con-

tends it was error to give the instruction because, as stated in its brief, "It ignored the entire issue of whether or not the policy ever became effective under its terms * *." We cannot agree. The instruction required the jury to find that the policy was in effect. After hypothesizing the issuance of the policy naming the plaintiffs assignor as beneficiary, the instruction reads "* * * and if you further find that thereafter, and while said policy was in effect, the said Annie Fowler came to her demise * * *." The defendant contends this is not sufficient and that the instruction must contain a specific negation of defendant's theory as was done in Winger v. General American Life Ins. Co., Mo., 345 S.W.2d 170, 1.c. 182. The hypothesization set out above clearly required the jury to find the policy was in effect and so recognized the defendant's theory, assuming arguendo, that such is necessary in plaintiffs' verdict-directing instruction. The instruction did require the jury to find the policy was effective when the event its maturity was conditioned upon, i. e., Annie Fowler's death, occurred.

■ It is too well settled to require citation that the latitude to be allowed counsel upon closing argument is largely a matter for exercise of the trial court's sound discretion. In the absence of a clear abuse of that discretion we should not interfere. It is impossible to completely understand all of the comments made by plaintiffs' counsel to which defendant objects without considering them in context which would unduly extend this opinion. Some of the comments were not subject to the objection leveled against them. As for example, the comment to the effect that the assured was living on a pension. That was the evidence. Other alleged objectionable comments made by defendant's counsel were cured by the action of the trial court, at least to the extent that our intervention is not required. For example, the trial court's admonition to the jury that they are to be guided by the evidence as they heard it and the instructions of the court. The other matters, when read in context in the transcript, are not such

that we can say that the trial court's action in refusing the defendant a mistrial was an abuse of its discretion.

The judgment should be affirmed. The Commissioner so recommends.

PER CURIAM.

The foregoing opinion by BRADY, C., is adopted as the opinion of the court. The judgment is affirmed.

WOLFE, P. J., ANDERSON, J., and WOODSON OLDHAM, Special Judge, concur.

RUDDY, J., not participating.